KEALEY PHARMACY & HOME CARE SERVICES, INC., et al., Plaintiffs-Counterdefendants-Appellees,

v.

WALGREEN COMPANY, Defendant-Counterplaintiff-Appellant.

No. 84–1865.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1984.

Decided April 19, 1985.

Rehearing and Rehearing En Banc Denied June 3, 1985.

Stanley M. Lipnick, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Ill., for defendant-counterplaintiff-appellant.

Richard E. Rosenberg, Nowlan & Mouat, Janesville, Wis., for plaintiffs-counterdefendants-appellees.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and GRANT, Senior District Judge.*

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

CUMMINGS, Chief Judge.

In September 1980, thirteen independently owned drugstores located in various southern Wisconsin towns sued defendant Walgreen Company, an Illinois corporation which operates company-owned drugstores throughout the United States. Prior to October 1, 1980, it also sold its and others' drug, beauty aid and household commodity products nationwide through fourteen hundred independently owned drugstores pursuant to a standard "Dealership Agreement." Plaintiffs sued for injunctive and monetary relief under the Wisconsin Fair Dealership Law (WFDL), WIS.STATS. § 135.-01 *et seq.*, in state court, but the suit was removed by defendant to the Western District of Wisconsin by virtue of diversity jurisdiction (28 U.S.C. § 1332). Paragraph "Fourth. (d)" of the Dealership Agreement with plaintiff Willis Drug provided that "[i]n the event Walgreen determines at any time to discontinue all similar Dealer's agreements, it may, at its option, terminate all agreements * * * upon a thirty days' written notice to the Dealer" (App. A5). Similar language appeared in paragraph "Fourth. (c)" of the defendant's Dealership Agreements with the other plaintiffs (App. A40).

On April 14, 1980, defendant decided to terminate all its Dealership Agreements effective October 1, 1980, on the ground that the dealers were producing an inadequate rate of return. Defendant so notified its fourteen hundred dealers by letter of April 17th. This action prompted the thirteen plaintiffs to sue. Because two of the pharmacies, Bernie's Walgreen Agency and Genoa City Pharmacy, had executed Dealership Agreements with defendant before the April 1974 effective date of the WFDL, the district court dismissed them from the suit and granted defendant summary judgment with respect to their claims on June 1, 1982. 539 F.Supp. at 1362–1363. This appeal by defendant involves the prevailing remaining eleven drugstores.

In her June 1982 opinion (*Kealey Pharmacy & Home Care Service, Inc. v. Walgreen Co. (Kealey I)*, 539 F.Supp. 1357 (W.D.Wis.1982)), Judge Crabb ruled that the WFDL applied to the parties and permitted Walgreen to terminate dealerships only for good cause, which was defined in Section 135.02 of the statute as:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b) Bad faith by the dealer in carrying out the terms of the dealership.

The court rejected defendant's argument that the Wisconsin Act permitted these nondiscriminatory, evenhanded and impartial terminations whose adverse impact upon the suing dealers would be much the same. Instead the court ruled that "a Wisconsin court would conclude that the [WFDL] law was intended to, and does, cover nondiscriminatory, across-the-board terminations of dealerships even if those terminations are undertaken because the grantor decides to withdraw from an entire geographic area, or to cease production of the products sold by its dealers, or to change its marketing structure, or for any other business reason." 539 F.Supp. at 1368.

The defendant's attack on the constitutionality of the WFDL was also rejected, but the court concluded that since the plaintiffs could be compensated adequately by an award of damages, no injunctive relief would be granted. Plaintiffs were awarded partial summary judgment on the issue of defendant's liability for damages. 539 F.Supp. at 1371.

The district court handed down its second opinion, *Kealey II*, in April 1984 after trial to the court on the issue of damages.[1] The eleven drugstore plaintiffs were awarded $431,182 pursuant to the WFDL. Included in this amount were their attorney's fees of $75,407 and costs of $15,428 which are reimbursable under Section 135.06 of the statute.[2]

Except for a dispute between the parties about preverdict interest, the district court's judgment is affirmed.

I. Applicability of the Wisconsin Fair Dealership Law

■ On appeal, Walgreen's first argument is that its agreements with plaintiffs were not within the scope of the WFDL, which provides that "No grantor * * * may terminate * * * a dealership agreement without good cause" (Section 135.03). Even though each recent agreement in question was drafted by defendant and entitled "Dealership Agreement"[3] (App. AA–3), Walgreen nevertheless contends that the agreements were not "dealership agreements" within the meaning of the WFDL. Formerly Walgreen had admitted that the plaintiffs were dealers within the meaning of the Act (539 F.Supp. at 1361–1362) and raised this issue for the first time at the trial on damages. In its about-face, Walgreen relies particularly on *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 300 N.W.2d 63 (1981); *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60 (1981), and *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262 (7th Cir. 1983). The *Foerster* and *Wilburn* cases, however, merely determined that the WFDL does not apply to manufacturer's representatives whereas here, as the dis-

---

**1.** *Kealey II* is reproduced in App. A2 to A33 and is officially reported at 607 F.Supp. 155.

**2.** The $431,182 total amount of damages awarded against Walgreen consisted of $294,705 for lost future profits, $55,020 for defendant's refusal to repurchase inventories of Walgreen-brand merchandise, $20,484 for the cost of removing Walgreen signs and for unused sales and pro-

motion materials and various store conversion expenses, less an offset of $29,864 awarded on Walgreen's counterclaim for goods sold to plaintiffs on open account.

**3.** Only the earliest contracts were dubbed "Retailer's Agreement" as shown in exhibits to amended complaint and to defendant's motion to dismiss.

trict court held, the plaintiffs met all the statutory elements for dealerships (App. A20),[4] with the court noting that "community of interest" as defined in Section 135.02(4) only requires "a continuing financial interest by the grantor and the grantee in either the operation of the dealership business or the marketing of such goods or services" and that "plaintiffs and defendant had a community of interest in the business of selling defendant's goods at retail" (App. A23 n. 5 and A24). Since the Wisconsin legislature defined "dealer" in Section 135.02(5) as a person "who is a grantee of a dealership situated in this state" and the term "dealership" was also broadly defined (*supra* n. 4), Walgreen's construction of the statute must be rejected.[5] As the Fifth Circuit pointed out referring to another grantor in *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir.1977), there is no merit in Walgreen's assertion that there was no "dealership" within the meaning of the WFDL because "The contract refers to the plaintiff as a 'dealer' and the ongoing duties of advertising, repair, warranty work and financial solvency establish the 'community of interest' required by the statute." 557 F.2d at 1164. Similarly here, as observed in the opinion in *Kealey II*, plaintiffs shared defendant's interest in the promotion of its name and reputation and made substantial financial investments in their stores and fixtures, in their Walgreen signs and Walgreen inventory. They displayed the Walgreen trademark prominently outside their stores and on the labels of their prescription drug containers. In addition, they spent their own money for advertising, sold directly from their Walgreen inventory to customers, extended credit and assumed all risks of late payment or nonpayment. They depended on their affiliation with Walgreen for their image, thus advising the public that their drugstores furnished the quality service and low prices associated with Walgreen. In sum, they shared Walgreen's interest in the promotion of its name and reputation for service, integrity and value. (App. A19–21.) Therefore these pharmacies were dealers just as much as the dealer involved in the *C.A. May Marine Supply Co.* case.

 Walgreen also relies upon *Foerster* in contending that the WFDL only applies to dealers where 50% to 60% of the dealer's products come from one primary source. But the Act makes no such limitation; instead the legislation was intended "to protect the thousands of small businessmen in Wisconsin who are franchisees." *Foerster*, 105 Wis.2d at 24. To this end the Wisconsin legislature provided that the WFDL was to "be liberally construed and applied to promote its underlying remedial purposes and policies" (Section 135.025(1)), two of which are:

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships; [and]

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

Section 135.025(2)(b) and (c). Indeed the Wisconsin Supreme Court has pointed out that the statute was enacted to protect the interests of the dealer "whatever its size." *Rossow Oil Co. v. Heiman*, 72 Wis.2d 696, 242 N.W.2d 176, 202 (1976). Consequently,

---

**4.** Section 135.02(2) provides:

"Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a *community of interest* in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise (emphasis supplied).

**5.** Although defendant also relies on *Kania, supra,* the agreement there provided that it did not purport to create a franchise or dealership (300 N.W.2d at 65), so that it does not support defendant's position. There the plaintiff was a piecework deliveryman selling his services to the defendant whereas the plaintiffs here have been selling the defendant's products to the public. Both plaintiffs and Walgreen shared in the profitability of the relationship, thus satisfying one of the hallmarks of a dealership as spelled out in *Kania*. 300 N.W.2d at 73.

we have applied the statute to a plaintiff dealer whose purchases from the defendant amounted to no more than four percent of its total sales in any year.[6] *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44 (7th Cir.1980).

Defendant's counsel argues that the Wisconsin statute does not apply to blanket terminations of dealerships such as occurred here. But the statute prohibits a grantor such as Walgreen from terminating "a dealership agreement without good cause" (Section 135.03). The good cause definition in Section 135.02, *supra* p. 348 does not permit blanket terminations of dealerships such as those effected by Walgreen. Under Section 135.03, "the burden of proving good cause is on the grantor" with respect to the termination of every dealership. Even though defendant relies upon *St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis. 1982), as being contrary to plaintiffs, the author of that opinion stated that he agreed with the district court's result in the present case based upon its facts (at p. 1248). Since Walgreen intends to maintain and increase its own stores in the same marketing area in competition with plaintiffs who helped to build up the Walgreen reputation and image there, it was not unfair for the Wisconsin legislature to prohibit a manufacturer and supplier such as defendant from terminating all its dealers because they produced an inadequate rate of return. Walgreen simply cannot defend on an inadequate rate of return ground since the only permissible good cause is defined in the statute as "failure by a dealer to comply substantially with essential and reasonable requirements imposed

upon him by the grantor" or "[b]ad faith by the dealer in carrying out the terms of the dealership" (*supra* p. 348). Defendant has made no such showing, and the legislature refused to adopt an amendment to the WFDL exempting grantors for withdrawal from a geographic marketing area such as undertaken by Walgreen (App. A50). Section 135.06 of the WFDL empowered the district court to award damages.

II. Constitutionality of the Wisconsin Fair Dealership Law.

Although Walgreen attacks the constitutionality of the WFDL, plaintiffs point out that defendant did not give the Attorney General of Wisconsin the notice judicially required as a prerequisite for a constitutional challenge to a Wisconsin statute. *Kurtz v. City of Waukesha*, 91 Wis.2d 103, 280 N.W.2d 757 (1979).[7] This failure, however, did not divest the court below of jurisdiction in this non-declaratory action. *Fessler*, 302 N.W.2d at 418.[8]

The constitutionality of this statute has already been upheld by two sister circuits. In *C.A. May Marine Supply Co. v. Brunswick Corp.*, *supra*, the Fifth Circuit labeled grantor Brunswick Corporation's commerce clause and due process arguments as "patently frivolous." Walgreen has added a freedom of contract attack on the WFDL, but there was no impairment of defendant's freedom to enter into contracts. The contracts that form the basis for this complaint were voluntarily entered into after passage of the WFDL, thus puncturing any such contention. The WFDL permits a grantor to terminate its dealership agreements for good

---

6. In 1979, the year prior to the termination, three plaintiffs purchased over thirteen percent of their merchandise from Walgreen, five plaintiffs purchased over eight percent and two purchased over six percent of their merchandise from defendant (App. A6).

7. In *Matter of Estate of Fessler*, 100 Wis.2d 437, 302 N.W.2d 414, 418 (1981), the *Kurtz* rule was satisfied because notice was given to the Wisconsin Attorney General while the case was pending in the Wisconsin Court of Appeals. 302 N.W.2d at 416.

8. While defendant contends that under 28 U.S.C. § 2403(b) (miscited as 18 U.S.C. § 2403(b) in its reply brief at p. 7 n. 5) the district court should have notified the Wisconsin Attorney General of defendant's constitutional attack on the WFDL, it had the burden of ensuring compliance with that requirement (*In re Snellgrove*, 15 B.R. 149 (Bankr.S.D.Fla.1981)), but noncompliance did not defeat the district court's jurisdiction. *Wallach v. Lieberman*, 366 F.2d 254, 258 (2d Cir.1966).

cause. The court did not enjoin the terminations but only awarded these plaintiffs the damages caused them by the terminations which were without the good cause required by the statute.

In the second opinion of a federal circuit faced with this problem, Circuit Judge Weick stated that the purpose of the statute was to equalize bargaining power between the parties to the dealership agreements and to promote fair dealing, certainly a legitimate exercise of the state's police powers. *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 823 (6th Cir.1977) (citing *Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 498, 71 N.W.2d 420 (1955)). As explained in *Kealey I*, it was reasonable for the legislature to determine that unilateral terminations of dealerships have an adverse effect upon dealers and the public, thus warranting "legislative subordination of the rights of contract and the free play of market forces" (539 F.Supp. at 1369). In this connection the district court stated (*id.* at 1369–1370):

> The strict prohibitions upon termination are a rational means of preventing grantors from subjecting economically-weaker dealers to severe financial hardship through termination or nonrenewal of dealership agreements; they serve to redress the imbalance of bargaining power between grantor and dealer. Application of the Act's penalties to all terminations other than those effected for statutorily-defined good cause is neither arbitrary nor unrelated to the goal of redressing the unequal bargaining power between the two parties to a dealership agreement.[9]

In *Kealey I*, Judge Crabb observed that a grantor terminating a dealer without just cause is not unduly penalized, for under Section 135.06 of the WFDL it is discretion-ary for the court, as here, to deny a dealer injunctive relief, while it is only mandatory, in order to redress unequal bargaining power between the parties, to award a dealer damages sustained by an unlawful termination. 539 F.Supp. at 1370. The record reveals defendant's ready ability to pay the judgment for plaintiffs, so that the statute as applied in no wise operated in a confiscatory manner unduly burdening commerce. Accordingly, we hold that the Wisconsin Fair Dealership Law was not unconstitutional as applied to defendant.

### III. Propriety of Damages Awarded

As noted earlier, Judge Crabb awarded plaintiffs $431,182 in damages. Her division of that amount among the plaintiffs is not contested. Under Section 135.06 of the WFDL, in view of defendant's violation, the dealers were entitled to damages they sustained as a consequence of the illegal termination.

The district court awarded plaintiffs $20,484 for miscellaneous expenses involving sign removal, conversion expenses and losses stemming from "sales aids and promotional materials." Because the parties stipulated the amount of plaintiffs' damages in this category, defendant does not attack this award apart from its argument, which we have already rejected, that Walgreen did not terminate "dealerships" (Br. 46).

Upon termination, defendant refused to repurchase from the plaintiffs all inventories and merchandise with the Walgreen name or trademark. Since the bases for the inventory damages, *viz.*, the cost to plaintiffs and the amounts recouped by them (App. A10), had been stipulated to by the parties prior to trial, it ill behooves Walgreen to assert in this Court that the

---

9. See also *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 824–825 (6th Cir.1977), also terming attacks like Walgreen's upon the constitutionality of the Wisconsin Act as frivolous. In *St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245, 1248 (W.D.Wis.1982), Judge Evans agreed with "the result in *Kealey [I]* based upon its facts," thus *sub silentio* upholding the Act as applied to Walgreen. In *Rochester v.* *Royal Appliance Mfg. Co.*, 569 F.Supp. 736, 739 (W.D.Wis.1983), and *United Beverage Co. v. Indiana Alcoholic Beverage Commission*, 566 F.Supp. 650, 651 (N.D.Ind.1983), *Kealey I* was discussed with approval, and the constitutionality of notice Section 135.04 as applied to a grantor wishing to leave Wisconsin was upheld in *Designs in Medicine, Inc. v. Xomed, Inc.*, 522 F.Supp. 1054, 1058–1059 (E.D.Wis.1981).

inventory damages are excessive. In selling this inventory, plaintiffs incurred losses of $55,020. The plaintiffs' markup of Walgreen products was 50% over cost and the profit margin was computed to be 9.4%. In a colloquy with counsel with respect to the Walgreen inventories that defendant refused to repurchase on termination, Judge Crabb explained her method of calculating these damages as follows:

I don't believe that the plaintiffs are entitled to their net profit on the sale. I think it is arguable and I do accept that they should be reimbursed for those overhead expenses which they had to incur in the process of getting rid of that merchandise [that] [t]hey did get rid of. (App. A35.)

The judge then explained that she started with the stipulated wholesale value of each plaintiff's leftover Walgreen inventory, doubled that, and then subtracted 9.4% from the doubled wholesale value of the inventory, and further subtracted the amount recouped from sales by the plaintiffs (App. A36). With respect to plaintiff Kealey's leftover Walgreen inventory, for example, she explained her methodology as follows:

That [final damages] number is $4,626.00. Just for the record, what I did was to start with wholesale value of the inventory [$3,480], double that, you get $6,960.00. I took 9.4 percent of $6,960.00 and then I subtracted $1,680.00 which was the amount recouped from the sale for a net of $4,626.00 which I consider the damages plaintiff Kealey incurred as a result of the termination as it relates to Walgreen inventory on hand as of April, 1980. (Id.)

We cannot fault this means of computing inventory damages. Indeed it did not even include a profit factor to plaintiffs who were deprived by these sales of Walgreen inventory of an opportunity to sell a competitive product at a profit to the same customer.

■ Walgreen disputes the formula on the ground that it should not be required to reimburse plaintiffs for overhead costs.

However, failure to do so would provide no adjustment for costs of sale. Since the plaintiffs used their own employees to sell this inventory which Walgreen should have repurchased, it would be unfair to deny them the costs for ridding themselves of this unwanted merchandise. Finally, the average profit rate used by the district court for the stores was not challenged by contrary evidence nor was the testimony that the markup on Walgreen products was 50% over cost disputed by any evidence proffered by defendant. Consequently we approve the $55,020 award. Defendant, of course, was awarded $29,864 which was the stipulated cost of goods delivered to plaintiffs by defendant for which it had not been paid. The $29,864 offset was divided among the eleven plaintiffs in amounts that have not been challenged and, as seen *infra*, defendant is entitled to pre-judgment interest on this feature of its counterclaim.

Defendant also argues that under Section 135.045 of the WFDL plaintiffs are limited to recovering the wholesale value of the inventory Walgreen refused to purchase (Br. 45). Section 135.045, however, merely affords a dealer the *option* of requiring the terminating grantor to repurchase inventories at the "fair wholesale market value." The damages provision of the WFDL, Section 135.06, does not restrict recovery of damages with respect to inventory on hand at the time of termination to this wholesale figure. Our interpretation of the WFDL does not create a conflict between Sections 135.045 and 135.06 of the statute where, as here, Walgreen refused to repurchase inventories it sold to plaintiffs.

■ The only significant argument defendant has made with respect to damages concerns the $294,705 the district court allowed plaintiffs for lost future profits. Plaintiffs' expert witness on this subject was Donald Nichols, Chairman of the Department of Economics of the University of Wisconsin in Madison. He was formerly Deputy Assistant Secretary of Labor of the United States and served as an expert wit-

ness as to lost future profits in two WFDL cases tried in the district court for the Eastern District of Wisconsin. His testimony was summarized in *Kealey II* and produced a present value of lost sales for the eleven stores of $3,237,872.[10] He determined that their variable profit rate was 9.4%. Multiplying those two figures produced the $295,000 lost future profits allowed by the district court. (App. A16–17.) This was the most conservative of three estimates Nichols provided for plaintiffs' loss of future profits and was the one selected by Judge Crabb as the proper amount of damages plaintiffs should recover in that category (App. A29).

Defendant argues that plaintiffs did not present adequate evidence to support the $295,000 lost profits figure accepted by the court. Walgreen sets forth numerous factors that bear upon the profitability of various plaintiff stores and Walgreen-owned stores which might explain the four percent decrease in growth rate observed by Nichols apart from the Walgreen termination decision. Defendant asserts that the court and plaintiffs' expert overlooked or ignored such factors as new competition, increased advertising and store improvements with regard to both individual Walgreen and former Walgreen Agency stores. Both Judge Crabb and Professor Nichols, however, were aware of these factors, presented in detail below by defendant, and agreed that they demonstrated all the more clearly that Walgreen's termination caused the 1981 four percent decline in gross sales:

> the only event common to all the stores is the plaintiffs' termination as agency stores in October, 1980. It is more probable than not that this event was the cause of the 1981 decline in the rate of annual sales growth for plaintiffs. The probability is enhanced by the evidence adduced by defendant to show that in 1981 some of the plaintiffs had increased competition, some had less; that some plaintiffs increased their advertising

budgets, some decreased them; that some plaintiffs felt the effects of the economic recession in their towns; that some plaintiffs increased their business dramatically by emphasizing a special line of products (for example, Kealey) or by negotiating exclusive prescription contracts with nursing homes (for example, Kunkel). In other words, defendant has helped to show that there was no one event common to all the plaintiffs that would account for the change in behavior in their average rate of sales growth other than their termination as Walgreen agencies. (App. A27–28.)

Future profits are difficult to prove and an estimate of lost future profits is inherently speculative to some degree, but these problems do not preclude recovery of damages under Wisconsin law. See *Reiman Associates v. R/A Advertising*, 102 Wis.2d 305, 306 N.W.2d 292 (1981). The conservative estimates utilized by plaintiffs' expert and adopted by the district court were computed with the reasonable certainty required and were not the result of mere guesswork. See *Wisconsin Liquor Co. v. Park & Tilford Distillers Corp.*, 267 F.2d 928 (7th Cir.1959); *Plywood Oshkosh, Inc. v. Van's Realty & Construction, Inc.*, 80 Wis.2d 26, 257 N.W.2d 847 (1977). It is not irrelevant to our holding that despite defendant's offer of numerous observations and criticisms, both here and below, regarding the damages figure adopted by the district court, Walgreen produced no expert witness on the issue of future profits.

IV. Dispute about Pre-judgment Interest

 The penultimate point at issue between the parties is defendant's contention that the district court should have entered statutory pre-judgment interest of 5% on the $29,864 recovery it received on its counterclaim for unpaid goods sold to plaintiffs. They in turn admit that defendant has a "right to pre-verdict interest" * * * "probably from October 1, 1980 to the date

---

**10.** The lost sales figure derives from projecting an estimated four percent decline in the rate of increase of gross sales for plaintiffs' stores in 1980–1981 over the twenty-year life of said stores, using a real interest rate of three percent (App. A17).

of the judgment" on April 20, 1984 (Br. 35). If defendant is unwilling to accept this time period, this cause will be remanded to the district court for a correct computation.

Plaintiffs assert that they too are entitled to prejudgment interest on their miscellaneous damages in the stipulated amount of $20,484 and on their inventory damages of $55,020. Since they did not cross-appeal from the district court's failure to award them such interest, this belated contention is not tenable.

### V. Delayed Removal of Walgreen Signs

 Finally, Walgreen asserts that it is entitled to contractual liquidated damages for some plaintiffs' use of its name on signs after the termination date of October 1, 1980. As Judge Crabb determined in *Kealey II*, the provision in the dealership agreements for Walgreen dealers to remove Walgreen signs upon termination or face a fine of $500 a month was of no force because defendant's invalid termination of plaintiffs' dealerships ended any obligations they had under those agreements. Defendant cites no authority to show that this claim for liquidated damages under the contract should not be forfeited under these circumstances. The district court properly held that the plaintiffs who did not remove the signs until after October 1, 1980, cannot be penalized.[11] In any event defendant never proved damages from the late sign removals.

The judgment of April 20, 1984, is affirmed, except that the $29,864 judgment for Walgreen on its counterclaim as to the plaintiffs' indebtedness on open account is vacated with directions to add thereto 5% interest from October 1, 1980 until April 20, 1984.[12] Costs and attorney's fees to plaintiffs.[13]

---

**11.** Willis testified that he did not remove his Walgreen sign in October 1980 because he had paid $3,000 for it upon becoming a Walgreen dealer in 1979 and was awaiting the court's decision on the injunction before throwing it away. After learning of the denial of injunctive relief, he did dispose of it in August 1982. The six other plaintiffs who did not remove their signs immediately upon termination did so in November 1980 (Busse Pharmacy), January 1981 (East Detroit Drugs and Delfield Pharmacy), March 1981 (Kealey Pharmacy), May 1981 (Monora Drive Pharmacy) and June 1982 (Langmack's Drugs). Their removals occurred on or before the denial of the permanent injunction and therefore were not untimely.

**12.** If the parties are unable to agree upon the dates for Walgreen's pre-judgment interest, the district court shall make the correct computation on remand.

**13.** Plaintiffs are entitled under Section 135.06 of the WFDL to costs and reasonable attorney's fees on appeal. Their bill of costs and the amount claimed for appellate legal fees shall be submitted to this Court 10 days hence. Walgreen shall file any objections 10 days thereafter and, if necessary, plaintiffs may reply 5 days thereafter.