[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED MAY 28, 1997
This case calls upon this court to construe the Connecticut Franchise Act (Connecticut General Statute §§ 42-133e, et seq.) which, up to this time, has been mainly interpreted by United States District Court and United States Court of Appeals decisions.
In its verified complaint, plaintiff Hartford Electric Supply Company alleges counts against defendant Allen-Bradley Company, Inc. for violation of the Connecticut Franchise Act (CFA), breach of contract, breach of implied covenant of good faith and fair dealing, and violation of the Connecticut Unfair Trade practices Act (CUTPA), and against individual defendants Robert A. Daub and Joseph Lupone for violation of CUTPA and tortious interference with contract. Plaintiff seeks a permanent injunction, compensatory and punitive damages. The action was started by plaintiff's application for an ex parte temporary injunction and an order to show cause. This court, Berger, J., issued an ex parte temporary injunction restraining defendant Allen-Bradley Company. Inc. from refusing to continue its franchise CT Page 5075 relationship with plaintiff, until further order of this court.
The parties agreed to waive a prompt hearing on a temporary injunction, to expedite discovery, and to proceed to a full hearing on plaintiff s right to a permanent injunction on the basis of the alleged violation of CFA and/or of CUTPA. Accordingly, the court leaves to another day the issue of damages to which plaintiff may be entitled for alleged violation of those statutes, and since plaintiff has claimed a jury trial, a jury determination of the common law counts of the complaint.
The facts are as follows:
Defendant Allen-Bradley (A-B) is a manufacturer of high-tech industrial automation products, e.g., drives that control the movement of industrial machines. It is a national concern that operates through distributors to which it assigns specific geographic areas throughout the country and, in turn, is dependent on them to market and sell its products.
Plaintiff, Hartford Electric Supply Company (HESCO) is a distributor of electrical supplies and equipment with offices in West Hartford and Milford. Connecticut. HESCO employs 56 people and has been an authorized distributor of A-B products for over fifty years. One half of HESCO's $20,000,000 annual business derives from the sale of A-B products. Although it also distributes the products of other manufacturers, many of those products (wire, switches, etc.) are complimentary to A-B's.
The relationship between HESCO and A-B is governed by a written "Appointed Distributor Agreement" (hereinafter the Agreement) that grants to HESCO the right to market A-B products within certain counties in Connecticut, designated as HESCO's Area of Primary Responsibility (APR). The Agreement runs for a term of one year and is subject to automatic renewal from year to year. It also provides that "either party may terminate [it] at any time, with cause or without any cause" on 90 days advance notice. Other terms of the agreement will be referred to herein as they become pertinent.
A-B had a Distributor Concern Program (DCP) designed to improve the performance of distributors failing to meet A-B standards. Under that program distributors in trouble were identified as early as possible and support offered from A-B sales and marketing departments to get the distributor back on CT Page 5076 track. Those distributors were regularly monitored and constantly pressured by A-B to increase sales. Although a positive program to encourage improvement, the DCP also contained the threat of termination if the distributor did not measure up.
After two years of weak sales, which coincided with Connecticut's weak economy, on February 12, 1992 HESCO was placed on the Distributor Concern Program. Among the reasons given were substandard sales performance, inadequate staffing and training of outside sales persons and specialists for A-B's hi-tech drives, and lack of proactive effort to identify new business.
HESCO was directed to prepare a 12-month business plan, to be reviewed by A-B, and to participate in joint meetings to address problem areas. The letter concluded, "unsatisfactory performance could result in termination of your appointment . . ."
At about that time William DePasquale was engaged in litigation with his elderly father for control of HESCO. William prevailed in the law suit, and in 1994 he purchased the firm from his father. Starting in the A-B fiscal year (10/1-9/30) 1994, HESCO'S purchase of A-B products increased by 20.6% over the previous fiscal year. In the 1995 fiscal year they rose another 22.5%. HESCO'S growth exceeded by 3.5% the 19% growth of A-B's United States automation business in 1995.
The improvement of HESCO'S performance in those years coincided with its hiring Dan Fadden as director of sales and marketing and Roy Lusk as director of operations. At a meeting at A-B's headquarters in Milwaukee in April 1995, HESCO presented a business plan setting forth growth goals for A-B products that satisfied A-B. At the end of the meeting HESCO was taken off the DCP.
At an October 23, 1995 meeting A-B officers expressed satisfaction with HESCO'S performance for the A-B fiscal year ending September 30, 1995. A week later, on October 30, 1995 Joe Lupone, an A-B branch manager in Enfield, met secretly with HESCO'S Dan Fadden and Roy Lusk, who criticized Mr. DePasquale for his poor management practices and unethical conduct. In November Bob Daub, an A-B district manager in Boston, met secretly with Fadden who repeated his damaging criticism of Mr. DePasquale. After those meetings the relationship between A-B and HESCO deteriorated. CT Page 5077
In December 1995, Lusk left HESCO for other employment and was not replaced. HESCO sales for the period April to December 1995 decreased. On January 22, 1996, A-B again placed HESCO on the DCP, giving as reasons inadequate staffing and training of sales personnel, departure of HESCO'S director of operations (Lusk), and concern about internal conflicts within HESCO.
In February 1996 Fadden, director of sales left HESCO. A-B continued extensive monitoring all aspects of HESCO'S operations to the point that Mr. DePasquale, in a letter of April 26, 1996, protested in anger at A-B's harassment:
 HESCO has provided outstanding productivity for Allen-Bradley in a difficult and still declining Connecticut economy. But instead of praise and support we are deluged with absurd and repetitive demands for paperwork of all kinds, with criticism of our staff, with insistence we hire new employees and reassign or get rid of existing ones and with continuing efforts by Allen-Bradley to diminish our stature in the marketplace and to spread the seeds of discontent among our people. This, however, is going to stop.
 We now find our days are consumed with trying to deal with increasingly irrational behavior by Allen-Bradley personnel . . .
 So, as we said in the beginning, enough is enough. We are not going to let you or anyone else from Allen-Bradley push us around anymore.
 HESCO will work as hard as ever to market your goods. . . . Otherwise you will leave us alone to do what we have always done well — sell your products, serve them and keep our customers satisfied. Forget remediation programs and your probationary threats. Our franchise agreement does not compel us to endure this from you . . .
Shortly after that letter, on May 22, 1996, Messrs Daub and Lupone recommended to Dan Reshel, A-B director of distribution sales, that A-B terminate HESCO. On June 27, 1996 Reshel wrote to HESCO terminating the A-B relationship as of September 30, 1996. The reasons given were: (1) A-B's disappointing four year CT Page 5078 experience with HESCO under the DCP; (2) HESCO'S lack of a stable, knowledgeable, and experienced management team to market and sell A-B products, (3) HESCO'S failure to train its people adequately relative to A-B products; (4) inadequate commitment and participation in A-B product promotion; (5) HESCO'S poor A-B product market share and sales performance; (6) lack of a cooperative working relationship, replaced by a "recalcitrant and sometimes belligerent attitude."
In February 1997 A-B wrote to HESCO congratulating HESCO on reaching $10,000,000 in sales of industrial automation products in fiscal 1996, one of only 21 distributors in the country.
Termination of the franchise will result in HESCO going out of business. Not only will it lose half its gross annual sales of $20,000,000 but also the opportunity to act as distributor for many of the other manufacturers it represents whose products are complimentary to A-B's.
 I
The first ground upon which plaintiff seeks a permanent injunction is violation of the Connecticut Franchise Act, Connecticut General Statute § 42-133e. CFA was enacted in 1972 and amended in subsequent years. Its genesis was recognition of the disparity between the superior economic strength of the franchisor and that of the franchisee and an attempt to remedy historic abuses within the franchise field. "Franchising in Connecticut," 54 Conn. Bar J. No. 5, 446-47 (Oct. 1980). As stated in Grand Light and Supply Co. v. Honeywell, 771 F.2d 672,677 (2d cir. 1985), "Thus it is clear the purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee."
From its origin the Act has been deemed "remedial in nature."Muha v. United Oil Co., 180 Conn. 720, 730 (1980). Such statutes "are to be liberally construed in favor of those whom the legislature intended to benefit." Hartford Fire Insurance Co. v.Brown, 164 Conn. 497, 503 (1973); Southland Corp. v. Vernon,1 Conn. App. 439, 444 (1984).
Plaintiff's invocation of CFA raises two issues: (A) does a franchise relationship, as defined by CFA, exist between HESCO and A-B; and (B) if so, has A-B terminated the franchise for "good cause"? CT Page 5079
 A.
The CFA at § 42-133e(b) defines a franchise as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, . . .; and (2) the operation of the franchisor's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, . . ."
Thus, a franchise has two elements: the right to offer goods or services (1) under a marketing plan or system substantially prescribed by the franchisor, and (2) substantially associated with franchisor's trade name. Both are requisite. Soriscio v.Lenox, Inc., 701 F. Sup. 950 (D.Conn. 1988), aff'd 863 F.2d 195
(2nd Cir. 1988).
1.
In construing the first element of a franchise, courts have focused "on the amount of control exercised [by the franchisor] in the conduct of the franchisee's business as a significant factor in whether a franchise has been created." Chim-Tek, Inc.v. General Motors Corp., 816 F. Sup. 123 (D.Conn. 1993).
In the only state court case dealing with the type of control necessary to create a franchise relationship, Consumer Petroleumof Conn, Inc. v. Duham, 38 Conn. Sup. 495 (1982) identifies the franchisor having the power to set prices, audit franchisee's books, inspect its premises, hire franchisee's employees, establish sales quotas, provide management training, and require premises kept illuminated and franchisee's employees wear uniforms. Duham was a summary process case in which plaintiff landlord sought to evict the defendant tenant and the latter claimed it was a franchisee under CFA. The factors considered related essentially to the retail trade. As the CFA has been applied by Connecticut federal district courts to other kinds of businesses, the types of control evincing a franchise have been better explicated, but the cases still fail to assign weights to those factors. A federal court warns, "There is no such precise formula as to how many of such factors must exist in the CT Page 5080 aggregate, before the control exercised by a manufacturer rises to a marketing plan or system prescribed in substantial part by a franchisor." Soriscio v. Lenox, supra, p. 960.
While federal court decisions are not binding on this court in construing our state statute (See Wright Moore Corp. v.Ricoh Corp., 908 F.2d 128, 142, n. 1 (7th Cir. 1990)), in the absence of state court decisions, they are entitled to some weight. On the bases of them and other decisions, this court concludes the following factors should be applied and weighed in this case to determine whether or not the control exercised by A-B over HESCO gave rise to a franchise relationship.
a. Requiring a marketing plan
As noted above, the first element of a franchise is the franchisor substantially prescribing the franchisee's marketing plan.
The Agreement and its addendum requires HESCO to prepare a business plan for sale of A-B products in the local market. The Agreement requires the plan to include targeted accounts, promotion program, sales forecast, training plan inventory plan, and demonstration equipment. These plans were approved by A-B and became a means of A-B controlling HESCO. A-B constantly monitored compliance with the plan and when there was inadequate adherence, intervened in HESCO's operations, such as recommending additional sales promotions, hiring specialized employees, participating in closing sales with HESCO's customers.
When in 1992 A-B determined HESCO was not complying with its business plan and failing to meet A-B performance standards, A-B put HESCO on its Distributor Concern Program. A-B listed HESCO's inadequacies in sales performance, sales promotion, staffing, employee training, and customer service. It demanded improvement in all those areas as the price for HESCO getting off the DCP. This program became the device for A-B dictating to HESCO virtually every aspect of its operation. For example, from time to time it sent to HESCO an "action list" of detailed things to be done by a specific HESCO employee by a precise date, such as "categorize accounts by size," "analyze lo-tech sales territories," "conduct kick off meeting with HESCO salesmen," "place branch inventory order with A-B," etc. Then A-B kept track of compliance with its action list by indicating on given dates the percentage of completion. CT Page 5081
A-B kept HESCO on DCP for three years, from 1992 to 1995. When in April 1995, HESCO presented a business plan approved by A-B. HESCO was taken off the DCP. By the fall of 1995, A-B was complaining HESCO was not meeting its plan's goals and in January 1996, HESCO was again placed on DCP.
A-B claimed at the trial the DCP was "voluntary" and designed only to improve a franchisee's performance. The evidence in this case is otherwise. The DCP was used by A-B to frighten distributors and subject them to A-B dictates of operation. Clearest indication of its mandatory character is that as soon as HESCO stated in April 1996 it wanted to get off the program, A-B terminated HESCO.
It is apparent from these facts that although HESCO proposed a business plan, once it was approved by A-B, it became A-B's marketing plan to enforce upon HESCO. Moreover, the DCP itself became the way A-B exercised control over distributors by threatening them with termination if they did not meet A-B's standards for getting off of it. The insistence upon business plans, the rigorous enforcement of them by A-B, the use of DCP to micro-manage and control HESCO warrant this court finding that A-B substantially prescribed the manner HESCO operated and marketed A-B's products.
b. Power over pricing
This is one of the most important criteria for determining the existence of a franchise. As stated in Petereit v. S.B.Thomas Inc., 63 F.3d 1169 (2nd cir. 1995) cert. denied,116 S.CT. 1351, 134 L.Ed.2d 526 (1996), "Price is perhaps the most fundamental aspect of a marketing plan. Where the prices of products are controlled by the manufacturer and not the distributor, such control effectively deprives distributors of independent judgment in conducting their business. Thus, the ability to set prices is quite indicative of franchisor's control."
In Petereit the court noted that while the distributor had some discretion as to the prices for individual customers, it was limited by the prices printed on the packages of English muffins. In the instant case before this court, A-B distributed a catalogue to the trade that listed the price for each product. A-B also instructed HESCO on price quotes for start-up and CT Page 5082 training of customers on the A-B industrial automation products. Clearly the catalogue established the maximum prices HESCO could charge.
There was a procedure for HESCO to charge less than the listed prices by applying to A-B to reduce its price on that product to HESCO so that HESCO maintained the same profit margin. A-B still controlled the price by its determining whether or not to give the discount to HESCO.
HESCO could also sell to its customers at below the listed price without a discount from A-B. However, A-B frowned on that practice because it diluted its national price policy. Moreover, HESCO's right to sell at prices which reduced its profit margins was not only illusionary, but Pyrrhic because it could not remain a viable and strong franchise if it did so.
Finally, A-B absolutely dictated the prices HESCO could sell to A-B's national customers located in HESCO's territory.
Thus, this court concludes that while HESCO had some limited discretion over prices to its customers, for practical purposes A-B effectively controlled the setting of those prices. This court gives great weight to that A-B power in determining the existence of a franchise between the parties.
c. Power over hiring and firing franchisee's personnel
This criterion is mentioned in Connecticut Petroleum ofConn., Inc. v. Duham, supra, applied as a factor in finding a franchise relationship under CFA in Carlos v. Philip BusinessSystems, Inc., 556 F. Sup. 769 (E.D.N.Y. 1983), and noted for its absence in finding a franchise relationship was not created inAckley v. Gulf Oil Corp., 726 F. Sup. 353 (D.Conn. 1989), aff'd889 F.2d 1280 (2d Cir. 1989); Soriscio v. Lenox Inc., supra: andAurigemma v. Arco Petroleum Products, 698 F. Sup. 1035 (D.Conn. 1988) (as to the gas station).
In the instant case, HESCO retained the ultimate power to hire and fire its personnel. However, A-B exerted enormous pressure on HESCO to hire specialists for its products, and sales and operations managers. The sales manager HESCO hired was one strongly recommended by A-B. A-B made it a condition for HESCO to sell its motion control products that HESCO hire a specialist in this field. One of the grounds A-B first invoked for placing CT Page 5083 HESCO on the DCP in 1992 was its failure to have adequate number of sales persons and specialists. During the three years HESCO was on the program, A-B constantly assailed HESCO to hire additional trained personnel. One of the important reasons it placed HESCO on the DCP in 1996 was that it had not found a replacement for its operations manager. A-B also urged HESCO to fire certain of its employees.
This court finds that the pressure A-B exerted on HESCO to make personnel decisions, particularly through the DCP, which always carried the implied threat of termination, amounted to a manner of control that underlays a franchise relationship.
d. Power to require training of franchisee's personnel
This criterion is mentioned in Connecticut Petroleum of Conn,Inc. v. Duham, supra, and applied as a factor in finding a franchise relationship in Chem-Tek, Inc. v. General Motors Corp.,816 F. Sup. 123 (D.Conn. 1993): Hydro Air of Conn., Inc. v. VersorTechnologies, Inc., 599 F. Sup. 1119 (D.Conn. 1984): Carlos v.Philip Business System, Inc., supra.
An addendum to the Agreement between HESCO and A-B provides, "as a requirement to develop this local market, distributors are expected to participate in training conducted locally at the factory and in regional locations."
The evidence was that A-B not only insisted upon, but provided frequent and intensive training of HESCO's sales and technical people. In fact, when HESCO failed to send personnel to training sessions, it was censured by A-B. Moreover, A-B also required HESCO to maintain a training center for its staff and A-B customers, and to train them at HESCO's expense. The extensive program of instruction that A-B demanded was part of A-B's marketing system for promoting its products, and is a significant factor in creating the franchise relationship.
e. Control over franchisee's inventory
This criterion was mentioned in Aurigemma v. Arco Petroleum Products, supra; and Carlos v. Philips Business System, Inc., supra.
The Agreement between HESCO and A-B required HESCO to maintain an inventory of A-B's various products at levels CT Page 5084 adequate to meet customer needs. The addendum to the Agreement further provided that HESCO must purchase minimum amounts of certain products, and maintain inventories of them totalling, in all, over hundreds of thousands of dollars. It also provided that the level and mix of inventory be determined by the local Allen-Bradley Sales Office, or by agreement between A-B's area manager and the distributor. It also provided HESCO must submit inventory reports on the 20th of every month. Pursuant to the Agreement, A-B monitored HESCO's inventory carefully and put pressure on HESCO to lower its turn rate to keep on its shelves more of A-B products.
The court concludes that while A-B did not completely dictate the levels of inventory of all A-B's products HESCO had to maintain, it exercised such substantial control as to warrant that fact being a substantial factor in the court determining the existence of a franchise relationship.
 6. Power to examine franchisee's financial records and to require an audit
This criterion is identified in Consumer Petroleum ofConnecticut, Inc. v. Duham, supra; held to be a factor for finding a franchise in Aurigemma v. Arco Petroleum Products,Inc., supra, and its absence found to be the basis for not finding a franchise relationship in Soriscio v. Lenox, Inc.,supra and Ackley v. Gulf Oil Corp., supra.
The Agreement between HESCO and A-B provides HESCO shall maintain records of sales of A-B products and maintain business records "reflecting the true financial condition and operating records of its business." A-B has the right to examine those records and make copies of them. A-B further required HESCO from time to time to submit audited financial reports.
The court finds this factor not as significant as the prior ones, but nevertheless, one to be weighed in determining the degree of control exercised by A-B.
Thus, this court concludes that A-B's practice of insisting on rigid adherence to business plans it demanded of HESCO and of using the DCP as a means of coercion to achieve compliance, in and of itself, established the first element of a franchise, namely, substantially prescribing the marketing plan or system of a franchisee. A-B's power over HESCO's pricing, in and of itself, CT Page 5085 likewise established that element. When there is added A-B's exercising power over the hiring and firing of HESCO's employees, training of HESCO's personnel to A-B's specifications, determining HESCO's inventory levels, examining HESCO's financial records and demanding audited reports, the conclusion is inescapable that A-B exerted the control over HESCO necessary to create a franchise relationship.
2.
The second statutory requirement for a franchise is franchisee's business being substantially associated with the franchisor's trademark, trade name or commercial symbol
No Connecticut state court cases have construed this provision of § 42-133e(b), but the federal district court ofConnecticut in Chem-Tek, Inc. v. General Motors Corp., 816 F. Sup. 123
(D.Conn. 1993) noted, "The requirement that the conduct of the franchise's business be substantially associated with franchisor's trademark does not require exclusivity."
In that case the court found that substantial association was proven by the distributor being identified as a representative of General Motors products, and using letterhead and business cards carrying General Motors trademark and logo types.
In the case before this court the evidence was that HESCO distributed A-B catalogues and promotional materials with both companies' name on it, A-B's sign was prominently displayed on HESCO's premises, HESCO's fliers contained the A-B logo. Also, HESCO was widely recognized as the leading distributor of A-B products in Connecticut for 50 years, and customers in the trade thought of HESCO and A-B as "one and the same." CooperDistributing Co. v. Amana Refrigeration, Inc., 63 F.3d 262, 271
(3rd Cir. 1995). Clearly, plaintiff here established this second element of a franchise.
Thus, this court concludes a franchise relationship existed between HESCO and A-B.
 B.
Section 42-133f provides that no franchisor shall terminate or fail to renew a franchisee "except for good cause which shall include, but not be limited to the franchisee's refusal or CT Page 5086 failure to comply substantially with any material and reasonable obligation of the franchise agreement . . ."[1]
It is well established that the burden of proving "good cause" is on the franchisor, not the franchisee, even if the franchisee is the plaintiff in the case. Petereit v. S.B. Thomas,Inc., 63 Fd at 1185; Kealy Pharmacy v. Walgreen Co., 761 F.2d 345
at 350: Chrysler Motors Corporation v. Nebraska Motor VehicleIndustry Licensing Board, 274 N.W.2d 862, 863 (Neb. 1979).
Since 1970 at least sixteen states have adopted franchise laws. (Broghammer, "Groseth International, Inc. v. Tenneco, Inc.,
Protecting South Dakota Farm Implement Dealers from Unilateral Termination by a Manufacturer Under S.D.C.L., 37-5-3," 33 South Dakota Law Review 146, 150-151 (1988).) All require termination by a franchisor for some variant of "good cause." The construction given to the phrase has varied with the precise language of the state statutes.
For example, the New Jersey statute reads: "For purposes of this Act, good cause for terminating, cancelling or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchisor." N.J.S.A. 56:10-5 (1997) (emphasis added). InWestfield Center Service, Inc. v. Citco Service Oil Company Inc.,386 A.2d 448 (N.J. Supra. 1978), where the franchisor sought to terminate the plaintiff franchisee because it was to franchisor's "economic advantage" to close a number of gas stations and sell the property, the New Jersey court held that was not good cause under its statute. In Carlos v. Philips Business Systems, Inc.,536 F. Sup. 769. (E.D.New York, 1983), where the franchisor sought to effectuate a marketing change by eliminating exclusive dealerships and instead selling through many dealers, a federal court held that was not good cause within the meaning of the New Jersey Statutes.[2] Likewise in Cooper v. Distributing Co. v.Amana Refrigeration, Inc., 63 Fd 3d 262, [63 F.3d 262], 269 n. 3 (3d Cir. 1995), the court noted that "good cause" under the New Jersey statutes was "a concept that is limited by the franchisee to substantially comply with those requirements imposed upon him by the franchisor."
Similarly, the Wisconsin Fair Dealership law defines good cause either as a "[f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor . . ." or "[b]ad faith by the dealer . . ." Wisc. CT Page 5087 Stat. § 135.02 (1997). In Kealy Pharmacy Home Care Services,Inc. v. Walgreen Company, 761 F.2d 345 (7th Cir. 1985) where the defendant franchisor sought to terminate a number of dealerships because they produced an inadequate return, the court interpreted that not to be good cause under the Wisconsin statutes.
The CFA differs from the statutes of other states by defining "good cause" as "including but not being limited to the franchise's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement . . ."
The legislative history of CFA sheds some light on the meaning of the underlined phrase in the quoted clause. The statute was originally passed in 1972 and simply provided that a franchise could not be terminated without giving the franchisee sixty days written notice. 1972 Public Acts, No. 72-287, § 2. The next year it was amended to provide that no franchise could be terminated "except for good cause." 1973 Public Acts, No. 73-500, § 2. The floor debate in the House of Representatives reveals the language was added to protect against arbitrary and abusive terminations, primarily of local gasoline dealerships by oil companies. Typical are the remarks of Representative Brunski describing the harm the amendment was designed to prevent: "The franchise garage operators in our state live in constant jeopardy. They live in fear of being put out of business on merely the whim of large oil companies." Conn. Gen. Assembly, House, Vol. 16, Part 4, p. 6974.
Oil companies and other franchisors felt the vagueness of the phrase "good cause" tipped the scale in favor of franchisees and they threatened to leave the state. In response to their concerns the legislature amended CFA to add that good cause "included but was not limited to" franchisees failing to comply with the franchise agreement. 1974 Public Acts No. 74-292, § 1. Representative Newman expressed the legislature's intent that "the objective" of the amendment is "to protect our Connecticut dealers from franchise cancellation and at the same time not drive the oil companies out of our state" Conn. Gen. Assembly House, Vol. 17, Part 10, p. 4926.
This legislative history was considered significant inPetereit v. S.B. Thomas, Inc., 63 F.3d 1169 (2d Cir. 1955). The issue in that case was whether good cause for termination under CFA was restricted to a failure on the franchisee's part or could CT Page 5088 include a legitimate business reason held by the franchisor.
In Petereit the defendant franchisor sought to reallocate the exclusive territories of its dealers because it was "good for business." The trial court (Petereit v. S.B. Thomas, Inc.,853 F. Sup. 55 (D.Conn. 1993)) found that not to be good cause within the meaning of the Connecticut statute. The court said, "To permit defendant to find cause in purportedly sound business judgment is to make the relationships illusionary. The contracts have reserved no such right to defendant. The Franchise Act refers to the necessity of `good cause' and then proceeds to illustrate that phrase. Thus clearly good cause is to be found in the failure or nonperformance by the franchisee." 853 F. Sup. at 62.
The Second Circuit, 63 F.3d 1169, reversed on that precise point. It found in the amendments to the statute "Connecticut legislature's acknowledgment that franchisor's economic interests must be accounted for in striking a balance between franchisee protection and attracting and retaining franchisors to do business in the state." 63 F.3d at 1184. It held "good cause is not limited to proving contractual breaches of the franchise agreement, but may be based on a franchisor's legitimate reasons." Id. It explained: "A seller of goods in the marketplace is justified in identifying untapped opportunities or underutilized potential and adjusting its distribution network to realize a greater profit. When the franchisor demonstrates that its business decision is legitimate and made in good faith — even if shown by hindsight to be made in error — a court should not replace the grantor's decision by its own." 63 F.3d at 1185.
This court does not have to rule upon the interpretation the Second Circuit Court of Appeals gives to our CFA. The case before it does not involve A-B seeking to terminate HESCO for business reasons, such as changing its distribution system, as distinguished from some failing of HESCO. Rather, A-B bases its termination decision on very specific claims of poor performance by HESCO. Those claims are: (1) A-B's disappointing four year experience with HESCO under the Distributor Concern Program, including failure to address program concerns and to achieve program goods: (2) HESCO's lack of a stable, knowledgeable and experienced management team; (3) HESCO's failure to train its people adequately on A-B products; (4) inadequate commitment and participation in A-B product promotion; (5) HESCO's poor market share and sales performance, particularly a 1996 sales decrease CT Page 5089 of 13.3% below 1995 bookings; (6) deterioration in the over-all relationship, cooperation being replaced by recalcitrance.
Relying upon the Second Circuit Court of Appeals decision inPetereit, A-B takes the position that the matter of HESCO's performance is within A-B's legitimate business judgment and as long as that judgment is exercised in good faith, good cause is established. Moreover, it is not subject to question by this court.
This court disagrees. First, the standard for evaluating the reasons advanced is not subjective but objective, not what the franchisor sincerely believes justifies termination but what is "reasonable from the perspective of a disinterested observer."Darling v. Mobil Oil Corporation, 864 F.2d 981, 989 (2d cir. 1989). This is consistent with our courts construing "good cause" in employment termination cases as being for "an objectively substantial reason." Apgar v. MRS Business System, Inc., No. CV-90-0385520, Hartford/New Britain J.D., (Schaller, J.) (Sept. 24, 1992); Slifkin v. Condec Corporation; 13 Conn. App. 358, 549
(1988). Likewise in interpreting the meaning of "cause" in municipal charters requiring cause for the removal of public employees, our Supreme Court has noted, "the question of whether the cause assigned constituted, of itself, a ground for removal is a judicial question." Moleno v. Board of Public Safety,154 Conn. 368, 375, (1966).
Second, when focus is on franchisee's performance, good cause under the CFA depends upon the meaning given to each of the words of the apposite clause: "franchisee's failure to complysubstantially with any material and reasonable obligation of thefranchise agreement." The point of reference must be the terms of the franchise agreement, not "requirements imposed upon the [franchisee] by the franchisor," as provided in the New Jersey and the Wisconsin franchise acts (supra), and not generalized obligations inferred from the franchise relationship. Regard must be had to provisions that are material, that is: "Important; more or less necessary; . . . going to the merits." Black's Law Dictionary 6th ed. (1990). The criterion is not breach of the contract — but failure of substantial performance. Clearly, there is a distinction: a franchisee can breach the contract and still substantially perform.
Thus, to prove good cause, A-B must establish that HESCO failed substantially to perform essential provisions of the CT Page 5090 Agreement between the parties. The reasons given by A-B for termination are not valid unless they meet this test.
Paragraph 6a of the agreement provides: "The Appointed Distributor will vigorously and aggressively promote and develop the market for the sale of Authorized A-B Industrial Automation Products as its regular and standard line in its APR [area of Primary Responsibility.]"
Paragraph 6a(4) provides that HESCO shall use "vigorous sales effort to convert customers" to buy A-B products where those customers are buying other makes.
A-B claims HESCO failed to comply with these provisions by poor sales performance over a five year period and particularly in the six months immediately prior to termination. The facts are HESCO sold $8,777,000 of A-B products in 1990 and $10,400,000 in 1995. These numbers represent an increase in sales of 18%, but when there is taken into account that the price of A-B products rose by 3%-4% a year during the period, the increase reflected virtually zero growth. However, this sales record does not in and of itself show a lack of sales effort. The evidence was that from 1990 to 1993 the Connecticut economy was depressed. Moreover, A-B does not indicate how HESCO's sales performance compared to that of similar distributors or even to the growth of A-B sales regionally or nationally in the same period.
What the evidence does reveal is that in fiscal year (10/1-9/30) 1994 HESCO sales of A-B products increased by 20.6% over the previous fiscal year and in 1995 there was another 22.5% increase, 3.5% greater than A-B's sales growth that year. Moreover, in the fiscal year 1996 HESCO's sales of A-B industrial automation products reached the $10,000,000 level, one of only 21 dealers in the country. While HESCO's sales declined 13.5% from October 1995 to April 1996, this is much too short a period to evaluate over-all sales performance of a franchise that has succeeded for fifty years.
Thus, this court concludes A-B failed to establish HESCO substantially failed to fulfill its obligation under the agreement to promote A-B's products vigorously and aggressively.
Paragraph 6a(1) provides that HESCO shall maintain an adequate inventory of A-B products based on A-B recommendations. While the evidence was that A-B frequently put pressure upon CT Page 5091 HESCO to increase its inventory by buying more of A-B products, the evidence also was that HESCO adequately serviced the needs of its customers from its stock on hand. The court concludes HESCO did not fail substantially to comply with this provision of the agreement.
Paragraph 6a(2) provides that HESCO shall maintain a staff of competent sales and marketing personnel trained to describe, demonstrate and quote A-B industrial automation products. While the evidence was that A-B insisted upon HESCO hiring specialists who could effectively sell A-B's technical products, the evidence also was that HESCO hired such specialists and promptly, as it could, replaced those who left.
A-B focused on the departures of Fadden and Lusk, directors of sales and of operations as an indication of HESCO's inadequate staffing at the top. But virtually as soon as they left, HESCO undertook sustained efforts to refill those positions. Again this court finds no failure of substantial compliance with paragraph 6a(2) of the agreement.[3]
A-B also gives as a reason for terminating HESCO its poor experience with HESCO under the Distributor Concern Program. The DCP is an internal program employed by A-B to goad what it deems to be weak distributors to improve performance by requiring them to set goals and demanding that they achieve them. The program is not mentioned in the Agreement, so HESCO's failing to meet A-B's demands under the DCP cannot, in and of itself, violate an obligation of the agreement and be a ground for termination.
The final reason A-B gives for terminating HESCO is HESCO's uncooperative attitude, based upon Mr. DePasquale's letter of April 16, 1996, in which he exploded in anger at A-B and told A-B to leave him alone to conduct his business his way. This court finds that letter was the clear result of A-B persistently badgering HESCO and threatening termination. A-B's district and regional managers, Mr. Lupone and Mr. Daub, proved to be tough corporate officers, not above exercising corporate power arrogantly. Mr. Lupone is much younger than Mr. DePasquale and showed him no respect. Both revealed an extraordinary insensitivity to the affect their harassment, even bullying tactics, had on its franchisee of more than fifty years. Their conduct precipitated DePasquale's letter. They cannot use it as an excuse for pushing HESCO out. Carlo C. Gelardi Corp. v. MillerBrewing Co., 502 F. Sup. 637, 651 (D.N.J. 1980). CT Page 5092
Thus, this court finds that A-B has not met its burden of proving that HESCO substantially failed to comply with any of the obligations of the agreement, and so A-B has not proven that it terminated HESCO for good cause. As a consequence, this court concludes HESCO must prevail on the First Count of the complaint alleging A-B breached CFA.
Since § 42-133g of CFA specifically provides for injunctive relief and the court further finds HESCO has established irreparable harm and an inadequate remedy at law flowing from the franchise termination, the court makes the temporary injunction permanent. By agreement of the parties, the matter of damages is left to a further hearing.
 II.
Plaintiff seeks an injunction and damages against A-B in the Fourth Count of its complaint and damages against Daub and Lupone in the Fifth and Sixth Counts of the complaint for violation of the Connecticut Unfair Trade Practices Act (CUTPA) §§ 42-110a, et seq.[4]
An unfair trade practice within the meaning of the statute consists of (1) a practice that offends public policy as expressed by "some common law, statutory or other established concept of unfairness"; (2) one that is "immoral, unethical, oppressive, or unscrupulous"; (3) one that causes substantial injury to consumers, competitors or other businessmen. McLaughlinFord, Inc. v. Ford Motor Co., 192 Conn. 558, 568 (1984); NorwichSavings Inc. v. Caldrello, 38 Conn. App. 859, 865 (1995). This is known as the "Sperry" or "cigarette" rule because Connecticut cases rely upon the seminal opinion in FTC v. Sperry HutchinsonCo., 405 U.S. 233, 244-45 n. 5 (1972).
All three criteria need not be satisfied to prove a violation of CUTPA. A trade practice may constitute a violation if it substantially meets one of the criteria or to a lesser extent, meets all three. Cheshire Mortgage Service, Inc. v. Montes,223 Conn. 80, 100 (1992).
The first criteria requires a determination of whether or not A-B's violation of CFA constitutes an unfair practice within the meaning of CUTPA. A number of statutes specifically provide that their violation constitutes an unfair trade practice. They CT Page 5093 include The Home Solicitation Sales Act, § 42-141; Home Improvement Act, § 20-427 (h). See also, General Statutes §§ 14-16c; 16a-22k; 16a-23a; 36-4351; 36-573; 38a-355; 42-103k;42-103aa; 42-115n; 42-115c; 42-115a; 42-126c; 42-141; 42-232; and42-251.
Without such a statutory directive our courts will not find that violation of a statute automatically amounts to a violation of CUTPA. Jacobs v. Healy Ford-Subaru, Inc., 231 Conn. 707
(1995). Rather, they will look to the underlying public policy of the statute and determine whether its breach implicates established concepts of fairness. Cheshire Mortgage Services,Inc. v. Montes, 223 Conn. at 107-12.
The public policy sought to be implemented by CFA is to protect franchisees from arbitrary and unjustified terminations. The legislative history reveals a substantial number of Connecticut businesses operate under franchises granted by national concerns. They hire many Connecticut citizens and contribute substantially to the Connecticut economy. Those Connecticut businesses invest heavily to develop a market for franchisors' products. Termination of such franchises without good cause can create great financial losses to franchisees and to the Connecticut economy generally.
Thus, this court concludes that A-B's violation of CFA by terminating HESCO without good cause so violates an important state public policy as to amount to a breach of an established concept of fairness. Several Connecticut federal district court cases reach the same conclusion: Chem-Tek, Inc. v. General MotorsCorporation, supra; Tillquist v. Ford Motor Corp., 714 F. Sup. 607,616 (D.Conn. (1989).
This court does not find the second criteria met namely, that A-B acted immorally, unscrupulously or unethically in the way it used the DCP to harass HESCO. A-B is a tough, aggressive franchisor, operating vigorously to maintain and improve its share of the market in today's competitive economy. It pressed HESCO hard to increase sales but it did not do so unethically. Nor does this court find the reasons given by A-B to terminate HESCO were pretextual or false. Bronx Auto Mall, Inc. v. AmericanHonda Motor Co., 934 F. Sup. 596, 612 (S.D.N.Y. 1996), aff'd., (2d Cir. 1997). CT Page 5094
But this court does find A-B's termination of the franchise would cause substantial injury to HESCO, in fact destroying its business. Thus, the third criterion of the Sperry rule is met.
Having found two of the three criteria met, this court concludes A-B violated CUTPA. Cheshire Mortgage Service, Inc. v.Montes, 223 Conn. at 113-14. That statute at § 42-110g also authorizes injunctive relief.
HESCO claims immoral, unscrupulous or unethical conduct by Daub in violation of CUTPA by causing HESCO's termination because he disliked DePasquale, and by Daub and Lupone in meeting in secret with Fadden and Lusk and passing on to A-B's higher management false and malicious information about DePasquale. The evidence does not sustain these claims. Daub may or may not like DePasquale but he did not induce A-B to terminate HESCO because of any personal animus. Daub and Lupone met secretly with Fadden and Lusk, but they passed on to A-B the information they received without embellishment or comment. Thus, this court finds HESCO failed to prove a violation of CUTPA by defendants Daub or Lupone.
CONCLUSION
Based on the foregoing, partial judgment may enter in favor of plaintiff HESCO and against defendant A-B on the First Count of the complaint for violation of CFA and on the Fourth Count for violation of CUTPA. The court enjoins defendant A-B from terminating or refusing to continue its franchise relationship with HESCO. The issue of damages for both violations will be determined at a further hearing.
Judgment may enter in favor of Daub and Lupone on the Fifth and Sixth Counts alleging CUTPA violations.
As for the Second Count against A-B for breach of contract, the Third Count against A-B for breach of implied covenant of good faith and fair dealing, and the Seventh Count against Daub and Lupone for tortious interference with contract, plaintiff has claimed a jury trial, and judgment on those counts must await the outcome of that trial.
SATTER, S.T.R. CT Page 5095