[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-captioned cases are summary process actions. The plaintiff in each is Getty Petroleum Marketing, Inc. (sometimes referred to as "GETTY"). In the first captioned case, defendant is Wagar Ahmad (sometimes referred to as "AHMAD"); and in the second, the defendants are Wagar Abmad, E-Z Save, Inc, and Shop-ways, Inc.(also sometimes referred to as "AHMAD").
The actions were tried separately[1] and both were dismissed for want of subject matter on May 17, 1999, in a decision which states, "Connecticut Franchise Act. (Connecticut CT Page 10515 General Statute §§ 42-133e, et seq.) is applicable to the parties herein, and the between the parties is that of franchisor-franchisee. The plaintiff did not provide proper notice to the defendants under the Connecticut Franchise Act for termination of the lease between the parties. Failure to provide proper notice under the Connecticut Franchise Act is a jurisdictional defect. Accordingly, this action is dismissed for want of jurisdiction. Jurisdiction may enter in favor of the defendants. A memorandum of decision will follow:" This of decision encompasses the court's conclusion as to each claim of law raised the parties and the factual basis therefor. Connecticut Practice Book § 64-1. The pertains to both actions because the decisive issues, pertinent findings and are the same.
 BACKGROUND
On March 16, 1993, Getty Petroleum Corp, as lessor, and Wagar Ahmad, as lessee, into a written Retail Gasoline Lease Agreement ("Lease") and Lessee Supply Contract (Supply Contract"). The Lease was for the use and occupancy of a retail gasoline station at 154 South Main Street Torrington, Connecticut. The Lease and Supply Contract for a period of three years, beginning on March 29, 1993, and ending on March 31, 1996. AHMAD subsequently may have assigned the Supply Contract and Lease to ShopWays, Inc. and E. Z. Save, Inc., but he remains personally responsible for payment and performance of all terms and conditions of the agreements. The lease terms were extended to March 31, 1999. GETTY is the successor in interest to the rights and obligations of Getty Petroleum Corp. under the Lease and Supply Contract.
On April 7, 1998, GETTY wrote to AHMAD to terminate the Lease and Supply Contract stating as reasons violations of the terms of the Supply Contract. The letter also states "Paragraph 23 of your Lease agreement provides that a default under your Lessee Supply Contract also constitutes a default under your Lease Agreement. By reason of your defaults our company hereby elects to terminate your Lease Agreement and Lessee Supply Contract as of May 10, 1998, at which time the terms of both your Lease Agreement and Lessee Supply Contract shall expire and you shall be required to vacate the premises and remove all of your personal property and surrender same to us." On May 14, 1998, Notice to Quit was served upon AHMAD for violation of the Lease and Supply Contract in failing to maintain proper inventory records between November 23, 1997, and December 2, 1997, and causing return of Electronic Fund Transfers from January 1, 1997, through December 31, 1997. On May CT Page 10516 29, 1998, GETTY filed a summary process complaint against Wagar Ahmad and the corporate assignees, defendants, E.Z. Save, Inc. and Shop-Ways seeking possession of the Torrington gasoline station.
On July 3, 1993, Getty Petroleum Corp, as lessor, and Wagar Ahmad, as lessee, entered into a second Supply Contract and Lease for the use and occupancy of a retail gasoline station located at 44 South Street, Bristol, Connecticut. The Lease and Supply Contract were for a period of three years and were extended to July 31, 1999. GETTY is also the successor in interest to the rights and obligations of Getty Petroleum Corp. under the Lease and Supply Contract for the Bristol station.
In a letter dated May 19, 1998, GETTY wrote to AHMAD to terminate the Lease and Supply Contract stating as reasons violations of the terms of the Lease in failing to use the premises for the sale of gasoline. The letter also states "By reason of your defaults our company hereby elects to terminate your Lease Agreement and Lessee Supply Contract as of May 29, 1998, at which time the terms of both your Lease Agreement and Lessee Supply Contract shall expire and you shall be required to vacate the premises and remove all of your personal property and surrender same to us." On June 9, 1998, Notice to Quit was served upon AHMAD for violation of the Lease and Supply Contract. On July 2, 1998, GETTY filed a summary process complaint against AHMAD seeking possession of the Bristol gasoline station.
 THE ISSUES
A) Jurisdiction of the Housing Session of the Superior Court
During the first trial, AHMAD sought a dismissal on grounds that the relationship of the parties was that of franchisor/franchisee and the housing session of the Superior Court does not have jurisdiction over franchise matters. That claim is without merit. Southland Corp. v. Vernon,1 Conn. App. 439 (1984). Southland was a summary process action in which the plaintiff appealed from the judgment of the trial court dismissing the action because it presented factual questions which the court deemed to be too complex for summary process. The action was brought by a franchisor/lessor against its franchisee/lessee. The agreement included a lease which terminated upon termination of the franchise. The plaintiff had delivered a termination notice claiming material breaches of the CT Page 10517 franchise agreement. The defendant then sought, and was denied, a temporary injunction of the termination. Thereafter, the plaintiff served the defendant with notice to quit and began the summary process action. The trial court first determined that the franchisor/lessor would be required to prove "good cause" for termination of the franchise in the summary process action in order to prove termination of the lease and then dismissed the action because the questions involved were too complex for a summary process action. On appeal, the Appellate Court reversed, noting inter alia that housing division judges can "glean the wheat from the chaff" or, in this case, distill the refined from the crude.
AHMAD has also challenged the jurisdiction of the court on the ground that GETTY did not comply with notice provisions of the Connecticut Franchise Act, General Statutes §§ 42-133e, et seq.(sometimes "CFA") for terminating the Leases and Supply Contracts.
AHMAD's invocation of the CFA raises the following issues: (1) whether a franchise relationship, as defined by the CFA, exists between GETTY and AHMAD; (2) if so, whether Getty has complied with the statutory requirements of the CFA for terminating the franchises and leases between them; and (3) if not, whether the failure to follow the procedures of the CFA deprives the court of jurisdiction over these summary process actions.
GETTY's arguments against dismissal of the actions for lack of subject matter jurisdiction will be addressed seriatim. They are: 1) The CFA was not pled as a special defense; 2) The CFA does not apply because a) both the federal and state governments have enacted franchise acts specifically designed to regulate the petroleum marketing industry; b) the defendants failed to establish a "marketing plan or system" as required by the CFA; c) the CFA does not apply to commission lessees, and d) failure to comply with notice provisions required by the CFA is not a defect which deprives the court of jurisdiction.
1) Failure to Plead The CFA as a Special Defense
Practice Book § 10-50 instructs that "[f]acts which are consistent with [a plaintiff's] statements [of fact] but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged." The purpose of this section of the CT Page 10518 Practice Book "is to apprise the court and opposing counsel of the issues to be tried, not to conceal basic issues until the trial is under way. . . ." (Internal quotation marks omitted)Sidney v. DeVries, 18 Conn. App. 581, 585, 559 A.2d 1145 (1989), aff'd, 215 Conn. 350, 576 A.2d 228 (1990). Additionally, Practice Book § 10-3(a) states: "When any claim made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number." The fundamental purpose of a special defense, like other pleadings, is to apprise the court and opposing counsel of the issues to be tried, so that basic issued are not concealed until the trial is underway. Bennett v. Automobile Insurance Co. ofHartford, 230 Conn. 795, 802 (1994). As with general pleading requirements, the purpose underlying Practice Book Section 10-3
is to "promot[e] the often expressed judicial policy of full, informative, comprehensive and open disclosure of legal claims, which promotes the identification, narrowing and resolution of issues before the court." Todd v. Glines, 217 Conn. 1, 8 (1991).
GETTY asserts that AHMAD has not plead or argued that Notice to Quit is defective. GETTY does acknowledge that AHMAD has plead that the Lease and Supply Contract terminations are void because GETTY did not comply with a sixty day termination notice requirement of the Connecticut Franchise Act. General Statutes § 42-133f(a).[2] AHMAD's pleading, initially filed pro se,
is not artful and does not cite to the applicable statute. Broadly read, however, AHMAD's pleading does assert a defense under the CFA. No requests to revise were directed to AHMAD's pleadings. Further, in opening statement, counsel for GETTY anticipated that franchise defenses under the CFA would be advanced by AHMAD at trial[3] Thus, counsel and court were apprised of the issue. Bennett v. Automobile Insurance Co. ofHartford. Id.
2) Applicability of the CFA
a) Federal And State Regulation
GETTY argues that the federal and state governments have enacted franchise acts specifically designed to regulate the petroleum marketing industry. It argues the Petroleum Management Practices Act, 15 U.S.C. § 2801-06 (the "PMPA") and Connecticut's Petroleum Franchise Act, General Statutes §§ 42-133j-133n (the "PFA"), govern the relationship of the parties. GETTY claims that it does not fall within the definition of a CT Page 10519 "franchisor" under either the PMPA or the PFA . . . GETTY relies onMerlino v. Getty Petroleum Corp., 916 F.2d 52 (2nd Cir. 1990) (upholding the dismissal of an action for of PMPA brought against GETTY's predecessor because it did not fall within the definition of"franchisor."). GETTY does not fall within the definition of "franchisor"[4] in state petroleum franchise act either because the definitions in the PMPA and the PFA are identical.
The defendants have not disputed that point in these actions.
AHMAD instead, and as a result, relies on the CFA, Connecticut's general franchise act, General Statutes §§42-133e, et seq.[5] GETTY contends the defendants' attempts to find coverage under the CFA should be rejected because "There is simply no authority, after enactment of the Connecticut Petroleum Act, for applying the General Franchise Act to a petroleum marketing relationship. "
The argument appears to be mainly one of preemption. InAutomatic Comfort Corporation v. D R Service, Inc., 627 F. Sup. 783
(D. Conn. 1986), the plaintiff had successfully sought a declaratory judgment that no franchise was created between it and the defendant under the Petroleum Marketing Practices Act (PMPA),15 U.S.C. § 2801 et seq. Defendant service station operator counterclaimed that under the Connecticut Petroleum Franchising Act (PFA), General Statutes. § 42-133j et seq. it was vested with rights as a franchisee and its termination was precluded. The district court held the Connecticut franchise regulatory scheme was not preempted by the federal PMPA absent indication that the state scheme would impair the purpose or effectiveness of the federal act, even though the PEA governed relationships not covered by the federal act. "As the state is only precluded from adopting, enforcing or continuing in effect any state law other than the same provision as is found in PMPA to the extentPMPA applies, it follows that where PMPA does not apply there isno preemption and the state is free to enact its own laws." Automatic Comfort Corporation v. D R Service, Inc., id. at 784. Because GETTY is not a "franchisor" under the PPMA or the PFA those Acts do not apply to these parties at all. Thus the PPMA does not preempt application of state franchise laws. By the same reasoning, Connecticut's specialized petroleum act, PEA, does not preclude application of the general franchise act to these parties.
There is nothing in the Connecticut Franchise Act, General CT Page 10520 Statutes §§ 42-133e, et seq. that exempts its application to a gasoline station, and there is nothing in the language of the PFA, General Statutes §§ 42-133j, et seq, that preempts application of the CFA to a gasoline station. When two statutes relate to the same subject matter, every effort must be made to find a reasonable field for the operation of both, and where there is a reasonable field of operation for each statute which does not impinge on the domain of the other, it is the court's duty to give them concurrent effect. Windham First TaxingDistrict v. Windham 208 Conn. 543, 553, 546 A.2d 226 (1988). The legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or inaction may have on them. Miller v. Eighth Utilities District,179 Conn. 589, 593-94, 427 A.2d 425 (1980). The CFA is "remedial in nature and thus should be liberally construed. Muha v. United Oil Co.,180 Conn. 720, 728-29 . . ."; Southland v. Vernon, supra p. 444; in favor of the class it seeks to protect. See Chem-Tek, Inc. v.General Motors Corp., 816 F. Sup. 123, 127(1). Conn. 1993). The legislative history of the general franchise act reveals that it was enacted primarily to protect gasoline station franchisees.[6] The later enacted petroleum franchise act was passed because of continued troubles with gasoline franchisors, not because the legislature intended to constrain franchisee remedies. AHMAD may, therefore, assert a defense under the Connecticut Franchise Act.
b) A Marketing Plan must Be Established Under the CFA.
Before the defendants can demonstrate that the notices provided by GETTY in terminating the Lease and Supply Contract were insufficient under the Connecticut Franchise Act, they must establish that AHMAD's relationship with GETTY is a "franchise" within the meaning of Section 42-133e.
Under the state's general franchise statute, a franchise is
an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily CT Page 10521 for its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer." General Statutes § 42-133e (b).
Thus, a franchise has two elements: the right to offer goods or services (1) under a marketing plan or system substantially prescribed by the franchisor, and (2) being substantially associated with franchiser's trade name. Both are requisite.Soriscio v. Lenox. Inc., 701 F. Sup. 950 (D.Conn. 1988), aff'd863 F.2d 195 (2nd Cir. 1988). Hartford Electric Supply Company v.Allen-bradley Company, Inc. et Al. 1997 Ct. Sup. 5074,19 CLR 363, No. CV 96562061S, judicial district of Hartford, May 28, 1997 (Satter, J.), pending appeal, Supreme Court Docket No: 16011.
There is no question or dispute that the defendants' businesses are "substantially associated with [GETTY's] trademark, trade name or commercial symbol."
Thus, the central issue in determining whether there is a "franchise" within the meaning of section 42-133e(b) is whether AHMAD was granted a right to offer or sell goods "under a marketing plan or system prescribed in substantial part" by GETTY. In assessing whether there is a right to offer goods or services under a marketing plan or system substantially prescribed by the franchisor, courts have focused "on the amount of control exercised [by the franchiser] in the conduct of the franchisee's business as a significant factor in whether a franchise has been created." Chem-Tek, Inc. v. General MotorsCorp., supra;
Hartford Electric Supply v. Allen-Bradley Co., supra, provides a comprehensive and detailed review of the factors considered by courts, mainly federal, in determining whether the control exerted by the lessor was sufficient to give rise to a franchise under the Connecticut Franchise Act. Those factors include the existence of a marketing plan, power over pricing, power to hire and fire employees, requiring the training of CT Page 10522 employees, control over inventory, and power to examine financial records and to audit. Id.
In Consumers Petroleum of Connecticut v. Duhan,38 Conn. Sup. 495, 452 A.2d 123 (1982), a summary process action, the defendant appealed claiming,inter alia, his agreement with the plaintiff constituted a franchise and the plaintiff could not, therefore, regain possession of the franchised premises without first complying with the statutes (42-133f and 42-1331) regulating notice of termination or non-renewal of franchises. The appellate session of the superior court, Daly, J., outlined a set of factors that further define a franchise. These factors include: whether the rent is based on the gallons of gasoline sold, whether the hours of operation are prescribed by the lessor, whether the lessor forbids the use of unapproved advertising signs, whether the lessor could audit the lessee's books, whether the lessor could inspect the station, whether the lessor required illumination of the premises at specific times, whether the lessor requires employee uniforms, whether the lessor reserved the right to set prices, whether the lessor hires the employees, whether the lessor establishes sales quotas and whether the lessor provides management training and financial support. Id., 498-99.
The Second Circuit Court of Appeals, in clarifying ConsumersPetroleum of Connecticut, Inc. v. Duhan, supra,38 Conn. Sup. 495, explained that [t]here is no precise formula as to how many of these factors must be present to find the level of control indicative of a franchise. . . . Not all of theDuhan factors are equally weighty or relevant in every case. They should be considered, along with other indicia of control, according to their significance to the business relationship under review." (Citation omitted.) Petereit v. S.B. Thomas, Inc.63 F.3d 1169, 1180 (2d Cir. 1995). Further, "[p]rice is perhaps the most fundamental aspect of a marketing plan. Where the prices of products are controlled by the manufacturer, and not the distributor, such control effectively deprives distributors of independent judgment in conducting their business." Id., 1181. InPetereit, the court held that a franchise relationship existed where the lessor inspected stores, kept books and records on customers of the stores, set prices, fixed promotions and discounts, controlled product placement on shelves, and set performance standards and procedures for out-of-date product Id.,
1181. CT Page 10523
With those factors in mind, the following pertinent findings were relied on in determining whether a franchise relationship exists in this case follow:
AHMAD operates three gasoline stations in Connecticut, one in Bristol, a second in Torrington and a third in Waterford. The three stations are exactly alike and have the same operations. The agreements between the parties are identical for both stations. The relationship between GETTY and AHMAD at the Bristol and Torrington stations is governed by a written "Lessee Supply Contract" and a written "Retail Gasoline Station Lease Agreement (Commission)."
Michael Fritz, a territory sales manager employed by GETTY, oversees the operations of "Getty branded" gasoline stations in Connecticut, where he is one of three territory sales managers. He oversees 31 Getty stations in an area that is bracketed by Bridgeport and New Haven, Enfield and Torrington. He regularly visits the stations.
The gasoline is sold by the station operator on a commission basis. Other items such as motor oil, steering oil and promotional items are not sold on a commission basis but are purchased from GETTY by AHMAD. GETTY fixes the retail price of the gasoline to be sold at the pump but does not set the price at which AHMAD sells the oil and other products. GETTY has promotions of items such as soccer balls and model oil tanker trucks that it asks its station operators to sell. GETTY representatives pressure the operator to sell the promotional items. AHMAD is told by the GETTY representative. "I'm sending you so much and that will be billed to you." GETTY provides advertising for the promotional items which bear the GETTY logo. Ahmad can sell only GETTY's gasoline and other petroleum products and cannot sell gasoline or petroleum products supplied by anyone else. AHMAD cannot sell Getty gasoline and petroleum products received from any source other than GETTY. GETTY approval is required for signs and advertising, including color schemes. The color scheme of the station is the same for all Getty stations — orange and a red and white logo. The convenience store on the premises must be painted cream and only GETTY signs may be placed there. AHMAD is required to illuminate the station, display the hours of operation, the toll free number of GETTY, and the GETTY credit card. GETTY also requires Ahmad and all his employees while working at the station to dress in the uniforms CT Page 10524 approved by GETTY. AHMAD has to buy the uniforms from stores identified by the GETTY representative. AHMAD is required to keep the restrooms clean, neat sanitary and adequately supplied; keep the Station in a clean, orderly and well lighted condition, free of trash.
The base monthly rental is $2,275.00 for the Torrington station and $3,405.00 for the Bristol station. For Bristol the `lease security' is $7,500.00 and the "contract security" is $11,000.00. For Torrington the lease security is $4500 and the contract security is $8500. There are also credit card and equipment agreements and a pole agreement There is a minimum gallonage requirement of 50,000 gallons per month. A penalty is assessed of six cents ($.06) per each gallon short of the minimum. The Bristol station sells approximately 60,000.00 gallons of gasoline monthly. The commission rate is six and a half cents ($.065) per gallon sold. AHMAD must obtain the business permits and licenses to operate the stations and must pay all expenses, taxes and fees for the maintenance and operation of the business.
GETTY has a Voluntary Retail Standards Program ("VRSP") which enables each Lessee to receive a quarterly credit of $1500 ($500 to be applied each month) against its fixed monthly rental obligation based on the award of points for achieving the various standards set forth in the Program. Determination of Lessees' compliance with the VRSP standards and the number of points awarded on a "Retail Standards Checklist" is made on a quarterly basis by GETTY's Territory Sales Manager or Quality Control Auditor, is in the sole discretion of Getty and is not subject to challenge. The points that are checked include whether uniforms are worn, GETTY signs are present, and stations are cleaned. Under the Supply Contract, AHMAD must operate the station in accordance with GETTY's standards of quality, appearance, cleanliness and service, provide adequate illumination for the station and qualified and neatly dressed attendants.
An aspect of VRSP is a time management system for the station's hours of operation which are electronically monitored by a system installed by GETTY at the premises,. The hours of operation for purposes of determining whether a rental credit has been earned are Monday through Friday from 6 a.m. to 10 p. m. and Saturday and Sunday from 7 a.m. to 10 p. m. Even if the station operator receives 75 points on the retail standards checklist, the station must remain open 98.5% of the scheduled hours of CT Page 10525 operation during the course of each calendar month to receive the $500 rental deduction or credit.
There is a required inventory records process. On a daily basis each location reports to GETTY the sales figures and inventory figures. The sales figures in gallons and dollars are read from the gas console for each gasoline product. The operator also reports a tank or book inventory reconciliation — the opening amount plus the daily delivery less the daily sales. The tanks are also stuck with a gauge which give GETTY the "stick reading" which is compared to the reported book inventory. The operator fills out a inventory record form on a daily basis. The sales information is either phoned or faxed in directly from the station by the operator on a daily basis to a GETTY accounting clerk. Daily cash receipts must be deposited no later than two p. m. on the following banking day into a bank account specified by GETTY. And by 8 a. m. the operator is required to transmit to the company all information necessary to reconcile the previous day's sales.
Based on the operations at the Torrington and Bristol stations and on the terms of the Leases and Supply Contracts[7]
and their riders, in light of the factors enumerated in Duhan,Automatic Comfort, AIIen-Bradley, and Petereit, AHMAD was clearly operating within a marketing plan dictated by GETTY.
c) Whether the CFA Applies to Commission Sales
The plaintiff argues that because the agreement with the defendants made them commission agents of the plaintiff, instead of purchasers of petroleum products, application of the CFA to their agreements would not serve the purposes of the Act. GETTY contends that the CFA does not apply to its relation with AHMAD because AHMAD does not purchase the product, does not have title to the product and therefore does not sell the product. Thus, GETTY argues, AHMAD) is not exposed to the inherent risk involved in agreements which require the purchase and sale of the product.
To support its argument that commission agents are not franchisees, the plaintiff cites case law interpreting the Robinson-Patman Act; 15 U.S.C. § 13; a federal anti-trust statute governing discrimination in price, services or facilities. The court need not and declines to look to federal cases interpreting an unrelated statute in the presence of the applicable Connecticut statute and relevant Connecticut CT Page 10526 interpretive case law. First, the court need not look beyond the plain language of the statute unless the language is ambiguous. See Pitchell v. City of Hartford, Id. Second, in the absence of state precedent, it is appropriate to look to comparable federal law. See Washington Trust Co. v. Smith, 241 Conn. 734, 740,699 A.2d 73 (1997). Here, the plaintiff refers only to an unrelated federal anti-trust statute, not a federal franchise statute.
One federal district court case in Connecticut does, however, lend support to Plaintiff's contention that the CFA should not apply to a commission arrangement. In Automatic Comfort Corp. V D R Service, Inc., supra, the court found the service station operator who was seeking protection against termination under the Connecticut Petroleum Franchise Act "was clearly operating within a marketing plan" but declined to find a franchise because "defendant was not at any substantial market risk, nor did it have any substantial indicia of entrpreneurial responsibility."Id., 786. The court further found the defendant was not in the business of "offering or selling" gasoline and therefore there was no franchise. The court stated that its finding that defendant is not within the protection of the Connecticut Petroleum Products Franchise Act does not run counter to any of the concerns and purposes set forth in the statute where the arrangement "has not adversely affected the flow of gasoline to a competitive marketplace." Id., 786. The district court engaged in a market risk analysis and measured "how far defendant is from the situation of a pure employee, who merely takes money and hands it over to his employer" — an analysis akin to that employed by the courts in the anti-trust cases relied on by GETTY.
This court declines to engage in that analysis or followAutomatic Comfort for the following reasons: 1) The district court was construing Connecticut's specialized petroleum franchise act, the PPA, which, as discussed above, does not apply to these parties; 2) The general franchise act, CFA, which is
applicable to these parties, has a broad remedial sweep and a focus on concerns and purposes beyond the "flow of gasoline to a competitive marketplace;"[8] 3) The defendant was not a licensed retailer, whereas, AHMAD is required to licenses and permits; 4) There is no mention of a lease in the AutomaticComfort case, and the market risk analysis is substantially altered when there is, as here, a lease between the parties; and 5) The market risk analysis in anti-trust cases involving commission/consignment arrangements is fact bound and seeks to CT Page 10527 resolve whether the commission/consignment arrangement under scrutiny is one of independent contractor or master/servant. Its use is counterintuitive in determining whether a marketing plan exists because the more control by the franchisor the more likely a marketing plan. See Hartford Electric Supply v. Allen-Bradley,
supra. Whereas, in assessing a price-fixing/tying arrangement, the more control the more likely an employment relationship[9]. In fact, in Automatic Comfort the district court did find a marketing plan. A commission/consignment relationship and a finding of master/servant for anti-trust purposes does not ipsofacto preclude finding a franchise.[10]
The CFA, moreover, does not apply just to sale of products but to an expansive field businesses engaged in "offering,
selling or distributing goods or services" under a marketing plan or system prescribed in substantial part by a franchiser. General Statutes § 42-133e. The court need not look beyond the plain language of the statute unless the language is ambiguous. SeePitchell v. City of Hartford, 247 Conn. 422, (1999). "Where the meaning of the statute . . . is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not subject to modification by way of construction." (Internal quotation marks omitted.) Id., 432.
The CFA was enacted to provide remedial relief broadly — which is how it was written. See Okee Industries v.National Grange Mutual Ins. Co., 225 Conn. 367, 373 (1993). The definition of one who "offers or sells goods is therefore to be construed broadly and inclusively to encompass a business relationship wherein a commission is paid to the franchisee. There is nothing in the language of the statute to suggest otherwise.
The Connecticut Franchise Act, Connecticut General Statute § 42-133e was enacted in 1972 and amended in subsequent years. Its genesis was recognition of the disparity between the superior economic strength of the franchisor and that of the franchisee and an attempt to remedy historic abuses within the franchise field. "Franchising in Connecticut," 54 Conn. Bar J. No. 5, 446-47 (Oct. 1980). As stated in Grand Light and SupplyCo. v. Honeywell, 771 F.2d 672, 677 (2d cir. 1985), "Thus it is clear the purpose of the statute to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee." That is the risk with which the CFA is concerned, whether there is a commission sale or not. CT Page 10528
d) The Notice Requirements of The CFA Are Mandatory AndJurisdictional.
The Connecticut Franchise Act is very specific as to the procedure which must be followed for terminating a franchise where there is a lease between the franchisor and the franchise for seeking possession of the leased premises. General Statutes § 42-133f and g.[11]
No franchisor shall terminate a franchise, except for good cause. The franchisor shall give the franchisee written notice of termination, at least sixty days in advance of termination, with the cause stated thereon. General Statutes § 42-133f(a).
If the franchise is operated on premises leased by the franchisor to the franchisee, and if the franchisor seeks to terminate the lease, the notice shall be served upon the franchisee by a sheriff or indifferent person and shall expressly state that the lease shall terminate upon termination of the franchise, and shall further state that the franchisee may have certain rights under sections 42-133f and 42-133g, which sectionsshall be reproduced and attached to the notice. General Statutes § 42-133f(b). Those rights include compensation for inventory and other supplies and injunctive relief.
A franchiser who applies to a court to obtain possession of the leased premises shall file with the court from which it seeks the order of possession (1) an affidavit from the clerk of the court that the court records indicate that no temporary injunction has been granted to the franchisee, (2) the return of service of the notice, (3) a copy of the notice and (4) an affidavit that the notice 42-133f has been served, that the notice period required has expired, and that no injunction to restrain termination has been issued. General Statutes §42-133g[12].
The legislature's use of the word "shall" generally evidences an intent that the statute be interpreted as mandatory. LeConchev. Elligers, 215 Conn. 701, 710, 579 A.2d 1 (1990); Farricielliv. Personnel Appeal Board, 186 Conn. 198, 203, 440 A.2d 286
(1982). "The test for determining whether the use of the word `shall' is mandatory or directory is `whether the prescribed mode of action is of the essence of the thing to be accomplished.'Vartuli v. Sotire, 192 Conn. 353, 360, 472 A.2d 336 (1984). That CT Page 10529 test must be applied with reference to the purpose of the statute." LeConche v. Elligers, supra.
"A statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way." State ex rel. Barlow v. Kaminsky144 Conn. 612, 620, 136 A.2d 792 (1957); see State ex rel.Barnard v. Ambrogio, 162 Conn. 491, 498, 294 A.2d 529 (1972).Farricielli v. Personnel Appeal Board, 186 Conn. 198, 204 (1982).
It is undisputed that GETTY did not comply with any of the mandatory requirements of the CFA for terminating a franchise and lease and for instituting an action for possession of the leased premises. GETTY argues, however, that the Notice to Quits served on AHMAD in both actions complied with General Statutes §47a-23 (a) which mandates "at least three days" notice before termination and that the statutes governing summary process do not require a longer notice period for terminations of leases with franchises. Further, GETTY argues that the only remedy for violation of Section 42-133f(a)'s notice provision is money damages and that procedural violations do not deprive the court of jurisdiction. These arguments are unavailing.
Proper notice is a mandatory condition precedent to a summary process action, and its absence is a subject matter jurisdictional flaw. See, Lampasona v. Jacobs, 209 Conn. 724,729-31, 553 A.2d 175, cert. denied, ___ US ___ 109 S.Ct. 3244,106 L.Ed.2d 590 (1989), and the cases cited therein. InLampasona, the issue was whether the then eight day notice to quit under the general summary process statute; General Statutes47a-23; or the sixty day notice under the mobile home summary process statute; General Statutes 21-80; applied to the defendant, who was the owner of a mobile home in the plaintiff's park. The Court, in upholding the trial court's dismissal of the action, held that a notice to quit was a jurisdictional condition precedent under both statutes. Id., 729.
In Glenn Chaffer, Inc. v. Kennedy, 37 Conn. Sup. 654 (1981), the plaintiff brought a summary process action to evict the defendant tenant incident to a condominium conversion. As here, the defendant was served with a notice to quit but sought to dismiss the action because the plaintiff had not complied with the notice provisions of General Statutes § 47-88b(b). On appeal from the trial court's dismissal of the action, the Appellate Session of the Superior Court stated: CT Page 10530
 Compliance with the statutory procedure for notice is a prerequisite to any valid and effective action under the statute. Where a specified mode of giving notice is prescribed by statute, that method is exclusive. Generally, where notification is required for some definitive purpose, and where valuable interests of the addressee are being destroyed, strict adherence to the prescribed procedure is required . . . The service of proper statutory notice to the tenant under 47-88b (b) affects the tenant's interest in the leased premises by limiting or triggering certain rights given him under the condominium act . . . Therefore, it is essential that the statutory formalities of serving notice be observed so that the tenant's rights will be established in fact and limited in time. (Citations omitted) Id., 659
The Connecticut Franchise Act provisions governing termination of a franchise where there is a concomitant termination of a lease mandate notification for a definitive purpose. The service of proper statutory notice to the franchisee under sections 42-133 (f) and (g) affects the tenant's interest in the leased premises by limiting the right to contest the termination in the summary process action and by triggering the right to seek injunctive relief prior to the institution of an eviction action. There is within the act itself the mandate that the lessee be informed of those rights. To adopt GETTY's argument that damages are the only remedy available to AHMAD for a violation of the notice provisions of the CFA is to ignore and to abrogate its intended protections for franchisees.
The legislative history of PA 86-238 which added subsections (b) and (c) of 42-133g is instructive.[12] When first proposed, PA 86-238 sought to limit the lessee/franchisee's right to contest the termination in a summary process action but before passage procedures were added to ensure that the franchisee is given notice and an opportunity to contest the termination — before that summary process — in an action for injunctive relief. As finally enacted, the 1986 amendment offers protections to both franchisor and franchisee when and if the franchisor follows the very specific procedure for terminating a franchise and obtaining an order for possession. At the very heart of that procedure is the giving of proper notice.
The notice requirements and procedures of the Connecticut Franchise Act are mandatory, and they are jurisdictional CT Page 10531 prerequisites to this court's entering an order returning possession of the premises to the plaintiff in a summary process action. Proceedings conducted or decisions made by a court are legally void where there is an absence of jurisdiction over the subject matter. Marshall v. Clark, 170 Conn. 199, 205, (1976); see Chrysler Credit Corporation v. FairfieldChrysler-Plymouth . . . Inc., 180 Conn. 223, 229, (1980);Krueger v. Krueger, 179 Conn. 488, 493, (1980). "`Any claim of lack of jurisdiction over the subject matter cannot be waived; and whenever it is found . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'" Ertel v. Carothers, 34 Conn. App. 18, 21,639 A.2d 1055 (1994).
Accordingly, these actions are dismissed for lack of subject matter jurisdiction.
TANZER, J.